# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-24632-CIV-ALTONAGA/Torres

**CAMILO HERNANDEZ**,

       Plaintiff,

v.

**KING OCEAN SERVICES LIMITED
(CAYMAN ISLANDS)
INCORPORATED**, *et al.*,

       Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendants King Ocean Services Limited (Cayman Islands) Incorporated ("King Ocean") and Sun Terminals, Inc.'s ("Sun Terminals['s]") Motion for Summary Judgment [ECF No. 34], filed on April 27, 2022. Plaintiff Camilo Hernandez filed a Response [ECF No. 37], to which Defendants filed a Reply [ECF No. 42]. The Court has carefully considered the Amended Complaint [ECF No. 13], the parties' written submissions,[1] the record, and applicable law. For the following reasons, the Motion is granted.

## I. BACKGROUND[2]

This case arises from a workplace injury Plaintiff sustained while employed as a container

---

[1] The parties' factual submissions include Defendants' Statement of Material Facts [ECF No. 33] ("SOF"); Plaintiff's Response in Opposition to Defendants' Statement of Material Facts and Plaintiff's Statement of Additional Material Facts [ECF No. 38] ("Resp. SOF"); and Defendants' Reply Statement of Material Facts [ECF No. 41] ("Reply SOF").

[2] Facts in this section are undisputed unless otherwise noted.

mechanic by Defendants.[3]  (*See generally* Am. Compl.).  King Ocean and Sun Terminals are corporations with their principal places of business in Miami-Dade County.  (*See id.* ¶¶ 10–11).

A.  Plaintiff's Injury and Medical Treatment

On March 2, 2020, while Plaintiff was at work, a piece of molten metal came into contact with Plaintiff's left ankle, causing a severe burn.  (*See id.* ¶ 25).  Due to the pain from the burn, Plaintiff fell while descending the scaffolding on which he was working.  (*See id.* ¶ 26).  He immediately notified his supervisor of the accident and requested medical attention.  (*See id.* ¶¶ 28–29).  Plaintiff alleges Defendants forced him to continue working for the rest of that day — an allegation Defendants dispute (*see* Reply SOF ¶ 83) — as well as the following two days, without providing any medical attention.  (*See id.* ¶¶ 30–31).

On March 5, 2020, Defendants referred Plaintiff to their worker's compensation physician, Dr. Chapnik, who diagnosed Plaintiff with a second-degree burn.  (*See id.* ¶¶ 33–34).  At that time, Dr. Chapnik cleared Plaintiff to return to work for light duty.  (*See* SOF ¶ 11).

Plaintiff informed Defendants of his diagnosis.  (*See* Am. Compl. ¶ 35).  Due to a lack of available light work, however, Defendants instructed Plaintiff to stay home and recover from his injury.  (*See id.*; SOF ¶ 12).  On April 2, 2020, after receiving treatment on several occasions, Plaintiff was cleared to return to work within 14 days.  (*See* SOF ¶ 18).  Plaintiff provided a copy of that medical clearance to Defendants' human resources manager, Isabella Montealegre.  (*See id.* ¶ 19).

On April 27, 2020, Plaintiff again visited Dr. Chapnik, who concluded Plaintiff had achieved maximum medical improvement in his ankle and was able to return to full duty with no

---

[3] In his Amended Complaint, Plaintiff alleges Defendants "were and are an integrated enterprise, an agent of each other, or joint employers."  (Am. Compl. ¶ 19).  Thus, Plaintiff asserts his claims against each Defendant individually and as joint employers.  (*See id.* ¶ 21).

functional limitations.  (*See id.* ¶ 21).  Dr. Chapnik sent a report containing this conclusion to Defendants.  (*See id.* ¶ 23).

B. Defendants' Requests for Plaintiff to Return to Work

Dr. Chapnik's report was the final medical document Defendants received regarding Plaintiff's injury.  (*See id.* ¶ 24).  On May 8, 2020, Defendants sent Plaintiff a letter via text message, email, and certified mail asking Plaintiff to either return to work by May 11, 2020, or notify Defendants that he did not intend to return to work.  (*See id.* ¶ 27; *see also* SOF, Attach. 8, May 8, 2020 Return to Work Letter [ECF No. 33-8] ("May 8, 2020 Return to Work Letter")).  On the same day, May 8, 2020, an attorney representing Plaintiff[4] responded via email to Defendants' letter, stating Plaintiff was in a wheelchair and could not return to work.  (*See* SOF ¶ 29).  Plaintiff's attorney also specified that Plaintiff was not voluntarily resigning or abandoning his job.  (*See id.*).

The effect of Defendants' May 8th letter is where the parties first disagree on a material fact: Plaintiff claims the May 8th letter terminated Plaintiff and revoked his employee benefits, like wages and access to Defendants' electronic systems.  (*See* Resp. SOF ¶ 31).  Defendants, in contrast, claim that while they ceased paying Plaintiff on May 8, 2020, they nevertheless held Plaintiff's position open after receiving the response from Plaintiff's attorney.  (*See* SOF ¶ 31).  The parties agree, however, that by May 8, 2020, Plaintiff was no longer entitled to paid leave.  (*See id.* ¶ 32).

On May 27, 2020, Plaintiff filed a petition for worker's compensation benefits against Sun Terminals and its insurer.  (*See id.* ¶ 34).  The next day, Plaintiff voluntarily dismissed that petition.  (*See id.* ¶¶ 35, 37).  On May 31, 2020, Defendants stopped paying Plaintiff's health insurance premiums and removed him from their benefit rolls.  (*See id.* ¶¶ 37–38).  The parties dispute

---

[4] For clarity's sake, the attorney who responded to Defendants' May 8th letter is not the same attorney or from the same law firm representing Plaintiff in the present action.

whether Defendants held Plaintiff's position open at that time.  (*Compare id.* ¶ 38, *with* Resp. SOF ¶ 38).

On June 5, 2020, Plaintiff sent Montealegre a series of text messages inquiring whether Plaintiff still had a job with Defendants.  (*See* SOF ¶ 40).  Montealegre responded that day, stating she had received Dr. Chapnik's report clearing Plaintiff to return to work but had not received any medical documents from Plaintiff indicating why he had not returned to work.  (*See id.* ¶ 41; *see also id.*, Attach. 7, Hernandez-Montealegre Text Messages [ECF No. 33-7] 13–16).[5]

On June 9, 2020, Montealegre sent Plaintiff another letter via text message, email, and certified mail asking him to specify by June 11, 2020 whether he intended to return to work.  (*See* SOF, Attach. 13, June 9, 2020 Return to Work Letter [ECF No. 33-13] 1 ("June 9, 2020 Return to Work Letter")).  The letter stated, "your job position is available for you and the company is expecting you to return to work immediately[,]" and "[i]f by Thursday 06/11/2020 we have not heard back from you, the company will assume that you have voluntarily abandoned the job."  (*Id.* (alterations added)).  Plaintiff never responded to Defendants' June 9th letter and never returned to work.  (*See* SOF ¶¶ 50, 52).

Having not received a response to the June 9th letter or any updated medical records, Defendants deemed Plaintiff's job abandoned.  (*See id.* ¶ 54).  Defendants therefore posit they kept Plaintiff's position open for 14 weeks following Plaintiff's March 2nd accident.  (*See id.* ¶ 56).  Plaintiff disagrees, insisting he was terminated on May 8, 2020.  (*See* Resp. SOF ¶¶ 54–56).

C.  <u>Alleged Discrimination Toward Plaintiff</u>

Plaintiff alleges Defendants began to treat him differently due to the physical disability and leave of absence arising from his injury.  (*See* Am. Compl. ¶ 38).  He identifies Defendants' May

---

[5] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

8th and June 9th letters as examples of different treatment. (*See id.*). Further, Plaintiff testified that Defendants discriminated against him by (i) sending return-to-work letters; (ii) ceasing his pay; (iii) cutting off his access to Defendants' electronic benefits system; (iv) requesting his medical records; (v) failing to give him a tetanus shot; and (vi) not communicating with him after he retained an attorney. (*See* SOF, Attach. 3, Hernandez Dep. Tr. [ECF No. 33-3] 68:21–69:15, 74:12–75:24 ("Hernandez Dep. Tr."); *see also* SOF ¶ 61).

Plaintiff characterizes the discriminatory conduct as (i) Defendants "making it difficult for [Plaintiff] to seek the medical care and treatment needed and then to recover so that he could return to his employment" (Resp. 12 (alteration added)), and (ii) Defendants' termination of Plaintiff (*see id.* 12–13). Plaintiff alleges he complained to Montealegre and a supervisor, Carlos Romero, about the purported disparate treatment. (*See* Resp. SOF ¶ 60; Am. Compl. ¶ 39).

Thus arises the parties' second disagreement as to a material fact: Defendants claim Plaintiff never complained about any allegedly discriminatory practices, while Plaintiff states he did complain about enduring discriminatory treatment. (*Compare* SOF ¶ 60, *with* Resp. SOF ¶ 60). Defendants also deny that any of the examples cited by Plaintiff constitute evidence of discrimination. (*See* Mot. 11).

D. <u>Plaintiff's Claims for Relief</u>

From his version of the foregoing facts, Plaintiff alleges seven causes of action. (*See generally* Am. Compl.). Counts I and II proceed under the Florida Worker's Compensation Act ("FWCA") and allege Defendants unlawfully intimidated and then discharged Plaintiff because he filed a worker's compensation petition. (*See id.* ¶¶ 46–50, 55–57). Count III proceeds under the Family Medical Leave Act ("FMLA") and alleges Defendants unlawfully failed to notify Plaintiff of his rights under the FMLA after he reported his injury. (*See id.* ¶¶ 68–70). Counts IV and V

allege Defendants violated the Americans with Disabilities Act ("ADA") and the Florida Civil Rights Act ("FCRA"), respectively, because Defendants treated Plaintiff differently on account of his physical disability.  (*See id.* ¶¶ 75–76, 87–88).  Similarly, Counts VI and VII allege Defendants violated the ADA and FCRA, respectively, by discharging Plaintiff in retaliation for his complaints about Defendants' discriminatory practices.  (*See id.* ¶¶ 99–102, 110–13).

In addition to actual and compensatory damages, Plaintiff seeks punitive damages for Defendants' alleged statutory violations.  (*See generally* Am. Compl.).

E. <u>Defendants' Motion</u>

Defendants now move for summary judgment on each of Plaintiff's causes of action.  (*See generally* Mot.).  Defendants also argue Plaintiff has failed to show he is entitled to punitive damages.  (*See id.* 17–18).  Finally, Defendants argue Plaintiff was employed only by Sun Terminals, not King Ocean, thus relieving King Ocean of liability for any alleged violations of the law.  (*See id.* 18–19).

## II.  LEGAL STANDARD

Summary judgment may be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court draws all reasonable inferences in favor of the party opposing summary judgment.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).

If the non-moving party bears the burden of proof at trial, the moving party may obtain

summary judgment simply by: (1) establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim and (2) showing the Court there is insufficient evidence to support the non-moving party's case. *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14209-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015). "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Id.* (citing Fed. R. Civ. P. 56(c)(1); alteration added; quotation marks omitted).

## III. ANALYSIS

### A. The *McDonnell Douglas* Framework

Crucial to the Court's disposition of the parties' arguments is the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff bringing an employment discrimination or retaliation claim must first establish a *prima facie* case of discrimination or retaliation according to the law governing the asserted claim. *See id.* at 802. The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for terminating the plaintiff. *Id.* If the employer satisfies this burden, the burden shifts back to the plaintiff to show the employer's reason is merely pretext masking discrimination. *See id.* at 804.

"Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013) (citations omitted). The *McDonnell Douglas* framework applies to Plaintiff's claims under the FWCA, ADA, and FCRA.[6]

---

[6] *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950–51 (11th Cir. 2000) (applying *McDonnell Douglas* to FWCA retaliation claims); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (applying *McDonnell Douglas* to ADA discrimination claims); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (applying *McDonnell Douglas* to ADA retaliation

B. <u>Counts I and II – The FWCA</u>

Section 440.205 of the Florida Statutes prohibits employers from discharging, threatening to discharge, intimidating, or coercing any employee due to the employee's valid worker's compensation claim. *See* Fla. Stat. § 440.205. To establish a *prima facie* case under section 440.205, Plaintiff must show "(1) he engaged in a statutorily protected activity; (2) an adverse employment action occurred; and (3) the adverse action was causally related to the employee's protected activity." *Ortega v. Eng'g Sys. Tech., Inc.*, 30 So. 3d 525, 528 (Fla. 3d DCA 2010) (citation omitted), *cert. denied*, 46 So. 3d 565 (Fla. 2010).

The most fundamental activity protected by section 440.205 is precisely what the statute identifies: filing a worker's compensation claim. *See id*. Hence, Defendants do not dispute that Plaintiff engaged in statutorily protected activity when he filed his worker's compensation petition on May 27, 2020.[7] (*See* Mot. 7). But here is where the parties' agreement regarding these claims ends.

1. <u>Adverse Employment Action</u>

Defendants first argue Plaintiff cannot state a *prima facie* case under section 440.205 because Plaintiff did not suffer an adverse employment action. (*See id.*). They assert Plaintiff abandoned his job by failing to respond to the June 9th return-to-work letter. (*See id.*). An adverse

---

claims); *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir. 2000) ("[A]ctions under the [FCRA] are analyzed under the same framework as the ADA.") (alterations added; footnote call number omitted).

[7] The Court notes that in his Response, Plaintiff argues he engaged in a statutorily protected activity by "advis[ing] Supervisor Romero of his pain and request[ing] medical care and treatment." (Resp. 5 (alterations added)). Simply reporting an injury to the manager on duty, however, is not a protected activity under section 440.205. *See Truffin v. N. Beach Tavern LLC*, No. 19-24468-Civ, 2019 WL 6841873, at *2 (S.D. Fla. Dec. 19, 2019). Equally as problematic, Plaintiff did not identify this purportedly protected activity in his Amended Complaint. (*See* Am. Compl. ¶ 49 (identifying Plaintiff's worker's compensation petition as the "motivating factor" that caused Defendants to intimidate Plaintiff)). Plaintiff may not use a brief to amend his complaint. *See Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017). As such, the Court declines to consider Plaintiff's complaints to Supervisor Romero as statutorily protected activity under section 440.205.

employment action is "a serious and material change in the terms, conditions, or privileges of employment[,]" such as termination.  *Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012) (alteration added; citation, emphasis, and quotation marks omitted).  When an employer advises an employee that the employee may return to work, but the employee voluntarily chooses not to, courts have concluded no adverse employment action has occurred.  *See, e.g.*, *Santandreu v. Miami Dade Cnty.*, 513 F. App'x 902, 906 (11th Cir. 2013); *Hills v. Wal-Mart Stores, Inc.*, No. 08-23197-Civ, 2010 WL 1839268, at *6 (S.D. Fla. May 6, 2010).

Here, Defendants' June 9th letter informed Plaintiff that he could return to work.  (*See* June 9, 2020 Return to Work Letter 1 ("Please note that your job position is available for you[.]" (alteration added))).  And although Plaintiff forwarded the June 9th letter to his attorney (*see* SOF, Attach. 14, June 9, 2020 E-mail to Attorney [ECF No. 33-14] ("June 9, 2020 E-mail to Attorney")), Plaintiff failed to send Defendants any response to the June 9th letter.  Only after Plaintiff failed to respond by June 11, 2020 — the response deadline noted in the June 9th letter — did Defendants terminate Plaintiff and consider his job abandoned.  (*See* SOF ¶ 54).

As noted, the parties disagree as to whether Plaintiff was terminated on May 8, 2020 — as Plaintiff argues — or June 11, 2020, after he abandoned his position — as Defendants argue.  (*Compare* SOF ¶¶ 54–56, *with* SOF Resp. ¶¶ 54–56).  While the date of Plaintiff's termination is certainly a material fact, the dispute as to that fact is hardly genuine.  The evidence shows Plaintiff's job remained open after the May 8th letter.

For example, the June 9th letter explicitly stated Plaintiff's job was still available to him.  (*See* June 9, 2020 Return to Work Letter 1).  Further, Defendants kept Plaintiff on their benefits roll until May 31, 2020, demonstrating the continued availability of Plaintiff's job after the May 8th letter.  (*See* SOF ¶¶ 37–38).  Finally, the response from Plaintiff's attorney to the May 8th

9

letter asked Defendants to keep the position open (*see* SOF., Attach. 9, May 8, 2020 Attorney Letter [ECF No. 33-9]), and Plaintiff did not receive any information indicating that request had been denied.

To support his position that he was terminated on May 8, 2020, Plaintiff offers the following evidence: after May 8th, he could no longer access Defendants' electronic systems, like ADP (*see* SOF Resp. ¶ 94); Defendants stopped communicating with Plaintiff after the May 8th response from Plaintiff's attorney (*see* Hernandez Dep. Tr. 68:21–69:15); and Montealegre instructed another employee to stop putting money on Plaintiff's card (*see* SOF Resp. ¶ 38). Even viewing these facts in the light most favorable to Plaintiff, they do not create a genuine dispute suggesting Plaintiff was terminated on May 8th.

First, Plaintiff offers no authority for his position that excluding his access to ADP constitutes termination of employment.[8] (*See generally* Resp.). Furthermore, while Defendants stopped communicating with Plaintiff for a period in May, they did so because Plaintiff's worker's compensation attorney had instructed them to. (*See* SOF, Attach. 1, Isabella Montealegre Decl. [ECF No. 33-1] ¶ 30 ("Montealegre Decl.")). Finally, the email from Montealegre is dated May 19, 2020 — several days after the May 8th letter — and instructs the other employee to stop paying Plaintiff's benefits at the end of the next two-week work period. (*See* SOF Resp., Attach. 12, May 19, 2020 Email [ECF No. 38-12]). The record demonstrates the other employee carried out Montealegre's instruction: Plaintiff was removed from the benefits roll on May 31, 2020, two workweeks after the email and several days after the May 8th letter. (*See* SOF ¶¶ 37–38).

---

[8] To the contrary, at least one court has concluded that an employer restricting access to its electronic systems while an employee is on leave does not constitute adverse employment action. *See Bender v. City of Clearwater*, No. 04-1929-Civ, 2006 WL 1046944, at *12–13 (M.D. Fla. Apr. 19, 2006) (finding no adverse action where, while employee-plaintiff was on leave, employer confiscated her laptop, restricted her access to email, and ordered other employees not to contact her).

From this record, a reasonable person in Plaintiff's circumstances would not have viewed the May 8th letter as a termination. *See Holland*, 677 F.3d at 1057 (employing a reasonable person standard in judging whether an employment action was adverse). Plaintiff therefore abandoned his job in June 2020 and did not suffer adverse employment action.

    2. <u>Causal Connection</u>

Even if Plaintiff suffered an adverse employment action, his FWCA claims nevertheless fail because there is insufficient evidence of a causal connection between his termination and the statutorily protected activity of filing a worker's compensation claim. *See Ortega*, 30 So. 3d at 528 (requiring employee to show the adverse employment action happened because employee sought worker's compensation benefits). Regardless of which date the Court accepts as Plaintiff's termination date, Plaintiff has failed to adduce evidence sufficient to suggest Defendants terminated him due to his worker's compensation petition.

Plaintiff relies on the termination's temporal proximity to his injury and worker's compensation claim, but "temporal proximity, without more, must be 'very close' to satisfy the causation requirement." *Wright v. Blackman*, No. 21-14244-Civ, 2022 WL 602381, at *5 (S.D. Fla. Feb. 7, 2022) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). Further, even if such proximity exists, it is overcome by Defendants asking Plaintiff to return to work via their June 9th letter — 12 days after Plaintiff filed his worker's compensation petition. Quite simply, if Defendants were still offering Plaintiff his position even after he filed his worker's compensation petition, then filing the petition did not cause Plaintiff's termination.[9]

---

[9] The Court further notes that if it accepts Plaintiff's proffered termination date of May 8, 2020, the causal connection is even weaker because Plaintiff filed his worker's compensation petition on May 27, 2020, several weeks *after* the purported May 8th termination. *See Leon v. Tapas & Tintos, Inc.*, 51 F. Supp. 3d 1290, 1296 (S.D. Fla. 2014) (expressing doubt as to any causal connection "where the adverse action occurred well before the protected activity").

In short, Plaintiff has not established a *prima facie* case under the FWCA because (i) he did not suffer an adverse employment action and (ii) even if he did, Plaintiff has not shown that filing a worker's compensation petition caused the adverse action.

### 3. Nondiscriminatory Reason and Pretext

Even putting aside Plaintiff's failure to establish a *prima facie* case, Defendants have articulated a legitimate, nondiscriminatory reason for terminating Plaintiff. *See McDonnell Douglas*, 411 U.S. at 802. Specifically, Montealegre stated the decision to terminate Plaintiff was based on Plaintiff's failure to respond to the June 9th letter or return to work. (*See* Montealegre Decl. ¶ 39). An employee's failure to return to work is a legitimate, nondiscriminatory reason for terminating the employee. *See, e.g.*, *Weiner v. Flyer Publ'g Co.*, 945 F. Supp. 1559, 1561 (S.D. Fla. 1996) ("Here the employer clearly set forth its reasons for issuing the discharge letter: the employee abandoned her post; cleared all her belongings, including photographs from her desk; indicated to a co-worker that she would never return; and, in fact, never returned."). And Defendants need not prove their nondiscriminatory reason for terminating Plaintiff; they must merely proffer it. *See Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). Thus, Defendants have met their "exceedingly light" burden under the *McDonnell Douglas* framework. *Id.*

Plaintiff's final shot at survival for his FWCA claims is showing Defendants' proffered reason for termination to be pretextual. To demonstrate pretext, a plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). Here, Plaintiff fails to identify any evidence suggesting Defendants masked their true reason(s) for terminating Plaintiff. The only evidence Plaintiff offers with respect to pretext is that "Defendants knew that Plaintiff was in the hospital

and could not do what they were asking him to do[,]" namely, return to work.  (Resp. 8 (alteration added)).

Returning to work, however, was not Plaintiff's only option: Plaintiff could have also responded to the letters indicating whether he intended to return to work.  (*See* May 8, 2020 Return to Work Letter; June 9, 2020 Return to Work Letter).  Despite this option, Plaintiff failed to respond to the June 9th letter, notwithstanding his ability to use email while in the hospital.  (*See* June 9, 2020 E-mail to Attorney).  Defendants had no reason to believe Plaintiff was incapable of responding by the June 11th deadline.  Defendants' alleged knowledge of Plaintiff's continued medical treatment does not suggest their proffered reason to be false and thus does not constitute evidence of pretext.

Said briefly, aside from engaging in a statutorily protected activity, Plaintiff has failed to meet his burden under *McDonnell Douglas* on every aspect of his FWCA claims.  Defendants are therefore entitled to summary judgment as to Counts I and II.

C. <u>Count III – The FMLA</u>

Under the FMLA, eligible employees are entitled to a total of 12 workweeks of leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D) (alteration added).  Although an employer must keep an employee's position open while the employee is on leave, leave granted under the FMLA generally need not be paid.  *See id.* § 2612(c).  The Eleventh Circuit recognizes two types of FMLA claims: interference and retaliation.  *See Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017).  While Plaintiff seems to conflate "interference" and "retaliation" in characterizing his FMLA claim (*see* Reply 10), his

FMLA claim clearly proceeds under an interference theory.  (*See* Resp. 16 (labeling Plaintiff's claim as one "for interference under the FMLA"); *see also* Am. Compl. ¶ 68).

Employers are prohibited from interfering with or denying an employee's exercise of FMLA rights.  *See* 29 U.S.C. § 2615(a)(1).  "An [FMLA] interference claim has two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit."  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015) (alteration added; citation and footnote call number omitted).

The FMLA provides two benefits relevant to the instant case.  First, an injured employee has the right to take 12 workweeks of leave.  *See* 29 U.S.C. § 2612(a)(1)(D).  Second, once an employee requests FMLA leave or provides information sufficient to alert an employer that the leave could be "for an FMLA-qualifying reason," the employer must notify the employee of the employee's eligibility to take FMLA leave.  29 C.F.R. § 825.300(b)(1).  Failure to notify the employee may constitute interference with the employee's FMLA rights.  *See id.* § 825.300(e).  Plaintiff argues Defendants denied him both these benefits.  (*See* Am. Compl. ¶¶ 68–70; Resp. 17).

1. <u>The Right to 12 Workweeks of Leave</u>

Like Plaintiff's FWCA claims, the date of Plaintiff's termination is crucial to sustain his FMLA claim.  If Plaintiff was terminated on May 8, 2020, his termination would be within the 12-workweek period guaranteed by the FMLA.  If he was terminated on June 11, 2020, Plaintiff's termination would be outside the 12 weeks guaranteed by the FMLA.

As explained, the record does not support Plaintiff's position that he was terminated on May 8th.  Although Defendants ceased Plaintiff's pay on May 8, 2020, the FMLA does not mandate Defendants to continue paying Plaintiff during his leave, nor does Plaintiff argue Defendants were obligated to do so.  *See* 29 U.S.C. § 2612(c).  Similarly, Defendants removed

Plaintiff from the benefits roll on May 31, 2020, only after his 12 weeks of FMLA leave had expired. (*Compare* SOF ¶¶ 37–38, *with* SOF Resp. ¶¶ 37–38). That Defendants continued to pay Plaintiff's benefits, like health insurance, after May 8th further undermines Plaintiff's position. Finally, Defendants' June 9th letter undisputedly states Plaintiff's job remained open in June. (*See* June 9, 2020 Return to Work Letter).

At bottom, despite his allegations to the contrary, Plaintiff has failed to show the existence of a genuine factual dispute regarding his termination date. And because his termination date came after 12 workweeks, Defendants did not deny Plaintiff the benefit of his 12-weeks' leave.

2. The Right to be Notified of FMLA Eligibility

Although an employer must notify employees of their FMLA eligibility, the employer's failure to do so will not entitle a plaintiff to relief absent the plaintiff showing he was harmed by the employer's failure to notify. *See Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006) (affirming summary judgment for employer where employee-plaintiff offered "no evidence that he suffered any damage" from employer's "technical" FMLA violation). Indeed, courts have dismissed FMLA interference claims where — despite an employer failing to give notice of FMLA eligibility — an employee still received all the leave to which he or she is entitled. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275, 1284 (11th Cir. 1999) (affirming summary judgment for employer because "a plaintiff suffers no FMLA injury when she receives all the leave she requests, and indeed is paid for most of it"); *see also Juback v. Michaels Stores, Inc.*, 143 F. Supp. 3d 1195, 1211–12 (M.D. Fla. 2015) (granting employer summary judgment where employee-plaintiff did not receive FMLA notice but nonetheless received all the leave he requested).

Here, because the record reflects Plaintiff was terminated on June 11, 2020, he received 14 weeks of leave from Defendants, which is two weeks more than what the FMLA requires. *See* 29 U.S.C. § 2612(a)(1). And Plaintiff's position remained open to him at the end of his leave; that is, until he abandoned the position. (*See* SOF ¶¶ 46, 54). Moreover, Defendants paid Plaintiff for much of his leave, even after his paid leave expired. *Cf. Graham*, 193 F.3d at 1275.

Plaintiff has thus established, at most, a technical violation of the FMLA based on Defendants' failure to notify him of his FMLA eligibility. Such "technical violations of the FMLA . . . are not compensable" where the employee fails to show he suffered any harm. *Drago*, 453 F.3d at 1307 (alteration added).

In sum, Plaintiff received the 12 workweeks to which he was entitled under the FMLA. Because he received leave (in fact, two extra weeks), payment for most of the leave, and a return offer for his position after the leave expired, Plaintiff has failed to demonstrate how he was harmed by Defendants' failure to notify him of his FMLA rights. Consequently, Plaintiff's FMLA claim fails, and Defendants are entitled to summary judgment on Count III.

### D. Counts IV and V – Disparate Treatment under the ADA & FCRA

Under 42 U.S.C. section 12112(a), an employer may not discriminate against a qualified employee on the basis of the employee's disability. *See id.* The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities . . . or being regarded as having such an impairment[.]" *Id.* § 12102(1) (alterations added). Similarly, the FCRA prohibits employers from discriminating against any employee on the basis of his or her "handicap." Fla. Stat. § 760.10(1). While the FCRA does not define handicap, disability discrimination claims under the FCRA use the same framework as ADA claims. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). The *McDonnell Douglas*

burden-shifting framework therefore applies to disability discrimination claims under the ADA and FCRA. *See Hillburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999).

      1. *Prima Facie* Case of Disability Discrimination

      Under *McDonnell Douglas*, Plaintiff bears the initial burden of establishing a *prima facie* case of disability discrimination. *See* 411 U.S. at 802. "To establish a prima facie case of disability discrimination, a plaintiff must show that he (1) is disabled, (2) is a 'qualified' individual, and (3) was subjected to unlawful discrimination because of his disability." *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1200 (11th Cir. 2014) (citation and footnote call number omitted).

      For purposes of summary judgment, Defendants do not contest whether Plaintiff is a "qualified individual" with a disability. (*See* Mot. 11). Rather, Defendants argue Plaintiff has failed to establish a *prima facie* case because "his stated evidence of discrimination is legally insufficient." (*Id.*).

      The Amended Complaint does not identify specific acts by Defendants that allegedly constitute discrimination against Plaintiff. (*See* Am. Compl. ¶¶ 71–94). The Response identifies two discriminatory acts: Defendants (i) making it difficult for Plaintiff to get medical treatment and (ii) terminating Plaintiff's employment. (*See* Resp. 12–13). Finally, as set forth in the Motion, Plaintiff's deposition testimony identifies six more acts of discrimination: (i) sending return-to-work letters; (ii) ceasing Plaintiff's pay; (iii) cutting off Plaintiff's access to Defendants' electronic benefits system; (iv) requesting Plaintiff's medical records; (v) failing to give Plaintiff a tetanus shot; and (vi) not communicating with Plaintiff after he retained an attorney. (*See* Mot. 11).

      The Court is not persuaded that any of the above facts constitutes evidence of discrimination sufficient to establish a *prima facie* case. To begin, Plaintiff's own testimony shows Defendants did not impede him from obtaining medical care; rather, Plaintiff abstained from

seeking medical care on advice from his girlfriend, who believed it was Defendants' responsibility to take Plaintiff to the doctor.   (*See* Hernandez Dep. Tr. 52:12–53:5).   Further, the record demonstrates Defendants terminated Plaintiff because he failed to return to work or respond to Defendants' letters.   (*See* Montealegre Decl. ¶ 39).   Plaintiff cites nothing in the record to contradict this assertion or suggest his purported disability was the reason for his termination.

Moreover, there is no evidence to suggest Defendants' return-to-work letters constituted discrimination or adverse employment action.  *Cf. Hammond v. Potter*, No. 04-cv-2533, 2006 WL 8431485, at *12, *16–17 (N.D. Ga. July 25, 2006) (granting summary judgment for employer where employee-plaintiff failed to present evidence that the return-to-work letters constituted adverse employment action, harassment, or discrimination), *report and recommendation adopted*, 2006 WL 8431583 (N.D. Ga. Aug. 24, 2006).  Next, while Plaintiff was entitled to leave under the FMLA, Defendants had no obligation to pay Plaintiff once his paid leave had expired.  *See* 29 U.S.C. § 2615(c).  Continuing, Plaintiff cites nothing in the record showing his exclusion from Defendants' electronic systems to be discriminatory.[10]

Likewise, Plaintiff cites no authority or any evidence showing Defendants' request for his medical reports to be discriminatory.  *Cf. Lyons v. Miami-Dade Cnty.*, 791 F. Supp. 2d 1221, 1227–28 (S.D. Fla. 2011) (finding County's request for employee's medical reports was not "based on any form of discrimination").  Nor does Plaintiff explain why Defendants were obligated to give him a tetanus shot, or that Defendants usually gave tetanus shots to injured employees.  Finally, as mentioned above, Defendants stopped communicating with Plaintiff at the direction of his worker's compensation attorney, so the lack of communication does not constitute evidence of discrimination.  (*See* Montealegre Decl. ¶ 30).

---

[10] As noted, an employer is well within its rights to limit an employee's access to the employer's electronic systems while the employee is on leave.  *See Bender*, 2006 WL 1046944, at *12–13.

To recap, Plaintiff's proffered evidence does not show that he was discriminated against. Plaintiff has therefore failed to adduce evidence sufficient to establish a *prima facie* case of disability discrimination.  For that reason alone, his ADA and FCRA disability discrimination claims fail.

2.  <u>Nondiscriminatory Reason and Pretext</u>

Not only has Plaintiff failed to establish a *prima facie* case of disability discrimination, he has also failed to provide evidence creating an issue of fact as to Defendants' reason for terminating Plaintiff.   Under *McDonnell Douglas*, assuming Plaintiff could show a *prima facie* case, Defendants would then be charged with articulating a legitimate, nondiscriminatory reason for terminating Plaintiff.  *See* 411 U.S. at 802.

Defendants have done just that: they terminated Plaintiff because he failed to return to work or respond to the June 9th letter.  (*See* Montealegre Decl. ¶ 39).  Again, Plaintiff argues this reason was pretextual because Defendants knew Plaintiff was still in the hospital and suffering from severe pain.  (*See* Resp. 14).  Plaintiff fails to show, however, that Defendants' proffered reason "was false, and that discrimination was the real reason."  *St. Mary's*, 509 U.S. at 515 (emphasis omitted).  Indeed, Plaintiff is unable to point out even one instance in the record where Defendants indicated Plaintiff's disability was the real reason for his termination.  As such, Plaintiff has failed to demonstrate pretext.

Like his claims under the FWCA, Plaintiff can neither establish a *prima facie* case nor show Defendants' reason for termination to be pretextual.  As a result, Plaintiff has not carried his burden under *McDonnell Douglas*, and summary judgment is appropriate on Counts IV and V.

E.  Counts VI and VII – Retaliation under the ADA and FCRA

In addition to prohibiting discrimination based on an employee's disability, the ADA and FCRA also prohibit employers from retaliating against an employee who opposes any act or practice of the employer that is made unlawful by the statute.  *See* 42 U.S.C. § 12203(a); Fla. Stat. § 760.10(7).  Because "Florida courts follow federal case law when examining FCRA retaliation claims," Plaintiff's ADA and FCRA retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework.  *Carter v. Health Mgmt. Assocs.*, 989 So. 2d 1258, 1262 (Fla. 2d DCA 2008) (citations omitted); *see Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 895 (11th Cir. 2014) ("We evaluate ADA and FCRA retaliation cases under the framework set forth in *McDonnell Douglas Corp. v. Green*." (citation omitted)).

1.  *Prima Facie* Case of Retaliation

First, Plaintiff must establish a *prima facie* case.  *See McDonnell Douglas*, 411 U.S. at 802. A *prima facie* case of retaliation under the ADA requires a plaintiff to show "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action; and (3) the adverse action was causally related to the protected expression."  *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004) (alteration adopted; citation and quotation marks omitted).  Defendants argue Plaintiff fails to establish each of these elements.  (*See* Mot. 13).

i.  Statutorily Protected Expression

Defendants first argue there is no evidence suggesting Plaintiff complained to Defendants about being discriminated against, or about Defendants' practices generally.  (*See id.*).  Plaintiff insists that he did in fact complain to his supervisor about allegedly discriminatory treatment he received.  (*See* SOF Resp. ¶ 60 (citations omitted)).  Again, Plaintiff's Response does not exactly match the allegations of his Amended Complaint.  (*Compare* Resp. 14 (identifying the "protected

activity" as Plaintiff requesting medical care and advising Supervisor Romero of continued pain), *with* Am. Compl. ¶¶ 99, 110 (alleging generally that Plaintiff engaged in protected activity by "complaining to Defendant[s] about [their] discriminatory practices). Nevertheless, unlike the parties' dispute regarding the date of Plaintiff's termination, Plaintiff has successfully shown a genuine dispute as to whether he opposed Defendants' alleged discrimination.

The parties' exhibits illustrate the factual dispute: Defendants offer Montealegre's sworn statement that Plaintiff never complained (*see* Montealegre Decl. ¶ 43), while Plaintiff offers his sworn deposition testimony that he did complain about his allegedly different treatment (*see* Hernandez Dep. Tr. 53:17–55:1, 63:5–10). Defendants argue Plaintiff "changes his theory" and "[c]ontradict[s] his Complaint" (Reply 9), but Plaintiff's purported contradictions are issues of credibility not suited for resolution at summary judgment, *see Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (labeling credibility determinations "jury functions, not those of a judge" when ruling on summary judgment). As such, Plaintiff has created a genuine issue of fact as to the first element.

    ii.  <u>Adverse Employment Action</u>

Despite establishing the first element of his retaliation claim, Plaintiff did not suffer any adverse action from Defendants. As the Court has exhaustively addressed, the undisputed facts demonstrate Plaintiff — by not returning to work or responding to the June 9th letter — abandoned his job with Defendants. Concomitantly, the record does not support Plaintiff's claim of adverse employment action. That Defendants terminated Plaintiff after they deemed him to have abandoned his job does not constitute an adverse employment action. *See Hills*, 2010 WL 1839268, at *6; *see also Carlisle v. Sallie Mae, Inc.*, No. 05-188-Civ, 2007 WL 141138, at *11 (N.D. Fla. Jan. 17, 2007) (concluding employee voluntarily abandoned job when she did not show

up for work and failed to respond to employer's letter regarding voluntary resignation). Once again, Plaintiff has failed to show he was subject to adverse employment action.

### iii. Causal Connection

Even if Plaintiff could establish a dispute of fact as to his termination date — such that he might have been subject to adverse employment action on May 8, 2020 — Plaintiff nevertheless fails to demonstrate a causal connection between his protected expression and his termination. *See Higdon*, 393 F.3d at 1219. Although Plaintiff asserts a causal connection exists, he points to no evidence in the record supporting his position. (*See* Resp. 15–16). Plaintiff simply reiterates Defendants' knowledge of his injury, their alleged denial of his request for medical care, and their termination of Plaintiff about three months after his injury. (*See id.*). Plaintiff cites no authority suggesting these acts can establish causation. Nor does he attempt to explain how these acts connect to his opposition of Defendants' discriminatory practices.

Because he can show no causal connection, Plaintiff has failed to demonstrate a *prima facie* case of retaliation. This independently warrants summary judgment for Defendants on Plaintiff's retaliation claims.

### 2. Nondiscriminatory Reason and Pretext

Assuming Plaintiff could establish a *prima facie* case of retaliation, *McDonnell Douglas* shifts the burden to Defendants to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff. *See* 411 U.S. at 802. Again, Defendants have carried that burden: Plaintiff failed to return to work or respond to the June 9th letter, which led Defendants to believe he had abandoned his position. (*See* Montealegre Decl. ¶¶ 37–39). Termination for failure to return to work is a legitimate, nondiscriminatory reason — even when the employee might not be physically able to come to work. *See Anderson v. JPMorgan Chase & Co.*, 418 F. App'x 881, 884 (11th Cir. 2011)

(citing *Gilchrist v. Bolger*, 733 F.2d 1551, 1553 (11th Cir. 1984)), *cert. denied*, 565 U.S. 1158 (2012).

Finally, Plaintiff has failed to provide evidence suggesting Defendants' reason for termination is merely pretext for retaliation.  Plaintiff again cites the purported temporal proximity between his termination and protected activity (*see* Resp. 16), but he fails to explain how that proximity, without more, demonstrates pretext.  *See Cooper Lighting*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." (citations omitted)); (*cf.* Resp. 16 (claiming Defendants terminated Plaintiff about three months after his injury and complaints about discrimination)).  Plaintiff has identified no evidence to suggest Defendants' proffered reason is untrue.  *See St. Mary's*, 509 U.S. at 515.  Plaintiff has therefore failed to show pretext as required by *McDonnell Douglas*.

As the Court has found with many of Plaintiff's other counts, Plaintiff neither establishes a *prima facie* case nor demonstrates Defendants' reason for termination to be pretextual.  By virtue of these shortcomings, Defendants are entitled to summary judgment on Counts VI and VII.

\*        \*        \*

As discussed above, the record in this case supports entry of summary judgment for Defendants on each of Plaintiff's seven claims for relief.  Because Plaintiff's substantive claims fail, the Court need not address the parties' arguments regarding punitive damages or whether Defendants jointly employed Plaintiff.

## IV.  CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment [ECF No. 34] is **GRANTED**.  Summary judgment will be entered by

separate order.  The Clerk is directed to mark this case as **CLOSED**, and all pending motions are

**DENIED** as moot.

      **DONE AND ORDERED** in Miami, Florida, this 6th day of July, 2022.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:    counsel of record